

E-FILED
Thursday, 12 March, 2020 09:58:38 AM
Clerk, U.S. District Court, ILCD

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

MAR 1 0 2020

for the

Central District of Illinois

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

THE RESIDENCE LOCATED AT 1698 HAMILTON DRIVE, URBANA, ILLINOIS 61802

)
)
)
)
)
)

Case No. 20-MJ- 7051

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated by reference

located in the _____ **Central** _____ District of _____ **Illinois** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §841(a)(1) | Distribution of Controlled Substances (Methamphetamine) |

The application is based on these facts:
See affidavit of ATF Task Force Officer Cully Schweska, which is attached hereto and incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Cully Schweska

_____
*Applicant's signature*

ATF Task Force Officer Cully Schweska
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/10/2020

City and state: Urbana, Illinois

s/Eric Long

_____
*Judge's signature*

Eric I. Long, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

IN THE MATTER OF THE SEARCH OF

THE RESIDENCE LOCATED AT 1698
HAMILTON DRIVE, URBANA,
ILLINOIS 61802

Case No. _20 - MJ - 7051_

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Cully Schweska, being first duly sworn, hereby depose and state as follows:

1.      I am a police officer with the Champaign Police Department and
have been so employed since January 2013. I am currently assigned to the
Investigations Division as a detective, with a primary function of investigating felony
offenses under the Illinois Compiled Statutes, including firearms and drug-related
offenses. I am also currently assigned as a task force officer (TFO) for the Bureau of
Alcohol, Tobacco, Firearms, and Explosives (ATF) and have been so assigned for one
year. In my role as a TFO for the ATF, I investigate violations of Title 18 of the United
States Code, as amended, including firearms-related offenses. Prior to my employment
with the Investigations Division of Champaign Police Department, I was a member of
the Street Crimes Task Force for approximately three years. In this role, I was
responsible for the investigation of firearm- and narcotics-related investigations.

2.      The facts in this affidavit come from my personal observations, my
training and experience, and information obtained from other agents and witnesses.

This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.     This affidavit is submitted in support of an application for a warrant to search the entire premises located at **1698 Hamilton Drive, Urbana, Illinois 61802** (hereinafter "**SUBJECT PREMISES**"), which is more particularly described in Attachment A, for the items specified in Attachment B, which items constitute instrumentalities, fruits, and evidence of violations of Title 21, United States Code, Sections 841(a)(1), and (b)(1)(A), distribution of or possession with intent to distribute controlled substances, and of Title 18, United States Code, Section 1957, money laundering.

4.     Based upon the following information, there is probable cause to believe that Wardell M. DOCKERY has utilized the SUBJECT PREMISES to facilitate his drug-trafficking activities, in violation of Title 21, United States Code, Section 841(a)(1). As such, there is probable cause to believe that, located within SUBJECT PREMISES, there is currently evidence, fruits, and instrumentalities of illegal trafficking in controlled substances and/or money laundering. I am seeking authority to search the entire SUBJECT PREMISES for items specified in Attachment B and to seize all items specified in Attachment B.

## PROBABLE CAUSE

5.     In my capacity as an Alcohol, Tobacco, Firearms and Explosives Task Force Officer and Champaign Police Detective, I have conducted an investigation that has shown Wardell Money Dockery (hereinafter referred to as DOCKERY) is

currently involved in the trafficking of methamphetamine in the Champaign County, Illinois, area.

### Confidential Informant Background

6.    The Confidential Informant (CI) involved in the investigation into DOCKERY has previously provided Det. Phenicie and myself with detailed information regarding persons involved in drug trafficking and firearms related offenses in the Champaign area. The information provided by this CI in the past has all been corroborated and/or proven true.

7.    The CI is cooperating with law enforcement in the present investigation for consideration on his/her pending charges for aggravated driving under the influence of drugs and felony retail theft. Furthermore, the CI has received monetary benefit for the information provided (less than seven hundred dollars). Detective Phenicie and I believe the CI to be reliable and accurate based on (1) our interactions and dealings with him/her and (2) the corroboration from other sources of the information the CI provided.

8.    In addition to the above-described pending charges, I am aware through criminal history records check that the CI has prior convictions for the following: three drug possession felony offenses, including two convictions in the previous two years; and two theft-related felony offenses between 2005 and 2015.

### Initiation of Investigation

9.    In my role as a CPD detective and ATF TFO, I learned in December 2019 from Champaign Police Detective Phenicie and CPD Detective Christian, as well as

Urbana Investigator Matthew Quinley, that DOCKERY was actively involved in drug trafficking activities within the Champaign, Illinois, area. This information had been provided by a separate confidential informant who has also been proven to be accurate in the past. I then was provided supplemental intelligence by CPD Detective Corey Phenicie confirming this information about DOCKERY's involvement in narcotics trafficking. Det. Phenicie advised me that, in his official capacity as a Champaign Police detective, he has become acquainted with a confidential informant (hereinafter referred to as "CI") who advised s/he was able to purchase methamphetamine "ice" from DOCKERY.

10.     During the month of December 2019, Detective Phenicie and your affiant met with the CI and were advised of the following information: The CI stated he/she has been personally involved in the sale/distribution and consumption of methamphetamines for approximately one year. He/she advised that, during that time, he/she has utilized a muscular black male known to him/her by the street name "Money" as his/her source of crystal methamphetamine. The CI further advised that he/she has seen "Money" in possession of large amounts of crystal methamphetamine, as well as large amounts of currency. Furthermore, the CI advised that "Money" has attempted to sell firearm(s) to the CI. Additionally, the CI provided telephone number 217-530-8188 for "Money."

11.     Through prior investigations and police encounters, Detective Phenicie and your affiant are aware of an individual identified as Wardell Money Dockery, who utilizes the street name "Money." Detective Phenicie and I are also aware

that DOCKERY is a black male, muscular in stature. DOCKERY has a history of involvement in narcotics trafficking, including six prior arrests and four convictions for drug-related offenses. DOCKERY's most recent conviction was a 2015 conviction for delivery of a controlled substance. For this offense, DOCKERY was sentenced to eleven (11) years in the Illinois Department of Corrections and remains on parole for that offense currently (projected discharge date of March 22, 2021). During this initial briefing conducted by Detective Phenicie and your affiant, the CI was shown a digital image of DOCKERY that had no identifiers viewable. The CI readily identified the person in the photo as "Money." Lastly, your affiant confirmed the phone number provided by the CI of 217-530-8188 is the same telephone number DOCKERY provided to his parole officer, Agent Roger Smetzer.

12.     After receiving the above-described information, your affiant utilized the CI to conduct a series of six controlled purchases of crystal methamphetamine from DOCKERY. The following is a summary of the controlled purchases that have been conducted.

### Controlled Purchases

**Controlled Purchase No. 1**

13.     On December 19, 2019, officers/agents met with the CI for the purpose of conducting the first controlled purchase of one-half ounce of crystal methamphetamine from DOCKERY. In the presence of law enforcement on a recorded telephone line, the CI called DOCKERY on telephone number 217-530-8188. A male identified by the CI as DOCKERY answered. In this recorded call, the CI and

DOCKERY agreed to meet at a pre-arranged location within the Central District of

Illinois in Champaign, Illinois. Prior to the controlled purchase, the CI and CI's vehicle

were searched for currency and contraband with negative results. The CI was then

provided with $360 official advanced funds (OAF) and equipped with a video/audio

recording device. The CI then entered his/her vehicle and waited for DOCKERY to

arrive to the location. Officers/ agents remained out of sight of DOCKERY, but

maintained constant visual surveillance of the CI during this time.

14.     DOCKERY called the CI and informed him/ her that DOCKERY

was arriving at the meet location. At approximately 3:39 p.m. on December 13, 2019,

officers/ agents observed a black colored Jaguar sedan bearing Illinois Registration

BW22227 arrive at the meet location. At that time, officers/ agents were unable to see

inside of the vehicle due to the Jaguar having dark, heavily tinted windows. Upon

arrival, the Jaguar parked near the CI's vehicle. Officers/ agents then observed the CI

exit his/ her vehicle and enter the black colored Jaguar.

15.     Less than one minute later, officers/ agents observed the CI exit the

Jaguar, and then the Jaguar departed the area. The CI reentered his/ her vehicle and

awaited the instruction of officers/ agents while under the constant visual surveillance

of officers/ agents.

16.     Once DOCKERY was out of the vicinity of the buy location, the CI

met with officers/ agents and provided them with the purported crystal

methamphetamine that the CI had purchased from DOCKERY. The CI then advised the

officers that, when he/ she entered the Jaguar, DOCKERY was the sole occupant. The

CI stated he/ she handed DOCKERY $360 of United States Currency (official advanced funds) and in exchange, DOCKERY handed the CI a quantity of crystal methamphetamine. The controlled purchase was video recorded utilizing a mobile video recording device, which confirmed the CI's description of events. Upon review, the video recording did not capture DOCKERY's face.

17.     The crystal methamphetamine obtained from DOCKERY by the CI was field-tested and returned a positive result for methamphetamine.  It weighed approximately 15.1 grams with packaging. The substance has been sent to the Illinois State Police Crime Laboratory for further analysis and the results are still pending.

**Controlled Purchase No. 2**

18.     On January 7, 2020, officers/agents met with the CI for the purpose of conducting a second controlled purchase of one-half ounce of crystal methamphetamine from DOCKERY. Through additional investigation described in further detail in Paragraph 59 below, law enforcement officers were aware that DOCKERY often is located at the residence at 3707 Boulder Ridge, Champaign, Illinois. In advance of the second controlled purchase, officers/agents positioned themselves outside of the 3707 Boulder Ridge, Champaign, Illinois, address to conduct surveillance. Officers observed the same black colored Jaguar bearing Illinois registration BW22227 that had been utilized in Controlled Purchase No. 1 parked outside of the building at 3707 Boulder Ridge.

19.     Other officers/ agents met with the CI at a separate location. Once again, the CI made a recorded phone call to DOCKERY at 217-530-8188 and a male

identified by the CI as DOCKERY answered. The CI and DOCKERY agreed to meet at a

specific location within the Central District of Illinois in Champaign, Illinois. Prior to

this meeting, the CI and CI's vehicle were searched by law enforcement for currency

and contraband with negative results. The CI was then provided with $360 official

advanced funds (OAF) and equipped with audio/video recording devices. The CI then

entered his/her vehicle, which was parked at the meet location, and waited for

DOCKERY to arrive. Officers/ agents again remained outside of sight, but maintained

constant visual surveillance of the CI. The CI was then instructed to exit his/her vehicle

and await the arrival of DOCKERY.

      20.    The officers/ agents stationed at 3707 Boulder Ridge, Champaign,

Illinois, observed DOCKERY exit 3707 Boulder Ridge and enter the Jaguar sedan. The

Jaguar then proceeded toward the buy location. DOCKERY's vehicle was followed

toward the meet location and was observed making a brief stop at a convenience store.

Once DOCKERY's vehicle stopped at the store, officers/ agents observed DOCKERY

exit the front passenger seat of the Jaguar sedan and enter the convenience store.

Moments later, DOCKERY was observed exiting said store, re-entering the Jaguar, and

proceeding directly to the meet location. Officers/ agents maintained constant visual

surveillance of the Jaguar during this time; during its travel from the store to the buy

location, no one exited the vehicle.

      21.    At approximately 2:12 p.m., officers/agents observed DOCKERY's

vehicle arrive at the meet location. At that time, officers/agents were unable to see

inside of the vehicle due to heavily dark tinted windows. The Jaguar parked near the

CI's vehicle, and officers/ agents observed the CI walk toward DOCKERY's vehicle. The CI then opened the rear passenger door to the Jaguar in which DOCKERY was located.

22.     At approximately 2:13 p.m., officers/ agents observed the CI exit DOCKERY's vehicle, close the door, and then the Jaguar sedan departed the area. The CI then entered his/ her vehicle and awaited the instruction of officers/ agents, while under the constant visual surveillance of officers/ agents.

23.     Once DOCKERY was out of the vicinity of the buy location, the CI met with officers/ agents and provided them with the purported crystal methamphetamine that the CI had purchased from DOCKERY. The CI stated when he/ she opened DOCKERY's vehicle door, he/she had observed an unknown female in the driver's seat, DOCKERY in the front passenger seat, and an unknown male passenger in the rear passenger seat. The CI stated he/ she handed DOCKERY $360 of United States Currency/ official advanced funds (OAF) and in exchange, DOCKERY handed the CI a quantity of crystal methamphetamine from the front passenger seat. DOCKERY and the CI had a brief conversation prior to the CI exiting the Jaguar.  Upon review of the covert recording, the video captured the front seat passenger, whose face was not readily identifiable, turning his/her body and extending his/her arm toward the middle console area of the vehicle. These actions were consistent with the location the CI stated DOCKERY had been seated during the drug transaction and money exchange. Furthermore, there was also a black male visible in the recording, seated in the backseat, located behind the driver's seat, which was consistent with the CI's statement. The side

profile of the male was captured on the video surveillance. Law enforcement, however, was not able to identify this male.

24.    The purported crystal methamphetamine obtained from DOCKERY during the second controlled purchase was field-tested with positive results and weighed approximately 14.7 grams with packaging. The substance has been sent to the Illinois State Police Crime Laboratory for analysis and the results are still pending.

**Controlled Purchase No. 3**

25.    On February 5, 2020, officers/agents met with the CI for the purpose of conducting a third controlled purchase of one ounce of crystal methamphetamine from DOCKERY. In advance of this controlled purchase, officers/agents again positioned themselves outside of the 3707 Boulder Ridge address and observed a silver Chrysler 300 bearing Illinois Registration BV17275 (among other vehicles) parked outside. Other officers/ agents met with the CI at a separate location. Once again, the CI made a recorded phone call to DOCKERY at 217-530-8188 and a male identified by the CI as DOCKERY answered. The CI and DOCKERY agreed to meet at a specific location within the Central District of Illinois in Champaign, Illinois. Prior to this meeting, the CI and CI's vehicle were searched for currency and contraband with negative results. The CI was then provided with $600 official advanced funds (OAF) and audio/video recording devices. The CI then waited at the meet location for DOCKERY to arrive. During this wait, officers/ agents maintained constant visual surveillance of the CI.

26.     After the recorded call was completed, officers/ agents observed DOCKERY exit 3707 Boulder Ridge Champaign, Illinois, and enter a silver Chrysler 300 bearing Illinois Registration BV17275. The Chrysler then proceeded toward the pre-arranged buy location. During the course of mobile surveillance, officers/ agents temporarily lost visual of DOCKERY's vehicle as it exited the west side of Boulder Ridge subdivision.

27.     Approximately seven minutes later, officers/ agents reacquired visual of the same Chrysler at the intersection of W. Bloomington Road and N. Prospect Avenue in Champaign, Illinois. Officers/ agents followed the Chrysler while maintaining constant visual surveillance of the Chrysler as it proceeded to travel onto I-74, eastbound.

28.     The Chrysler exited I-74 onto N. Cunningham Avenue and traveled southbound before turning eastbound on Perkins Road Urbana, Illinois. DOCKERY's vehicle then made an abrupt turn into an unknown driveway before officers/ agents lost visual contact of the vehicle.

29.     Approximately twenty-two minutes later, officers/ agents reacquired the same Chrysler 300 as it arrived in the immediate vicinity of the meet location. The Chrysler then arrived at the meet location. At that time, officers/agents were unable to see inside of the vehicle due to heavily dark tinted windows. The vehicle parked near the CI's location and officers/ agents observed the CI walk toward the Chrysler 300 sedan and enter the rear-passenger seat of the vehicle.

30.    Approximately one minute later, officers/ agents observed the CI exit the Chrysler, close the door to the vehicle, and then the Chrysler departed the area. The CI then proceeded back to the meet location while under the constant visual surveillance of officers/ agents.

31.    Once DOCKERY was out of the vicinity of the buy location, the CI met with officers/ agents and provided them with the purported crystal methamphetamine that the CI purchased from DOCKERY. During the debrief, the CI advised that, when he/ she opened the door to the Chrysler, he/she observed a female in the front passenger seat, and DOCKERY in the driver's seat. The CI advised the female in the front passenger seat has sold him/ her narcotics on a prior occasion. Once the CI had entered the Chrysler, DOCKERY handed the CI a quantity of crystal methamphetamine from the front seat and in exchange, the CI handed DOCKERY $600 of United States Currency/ official advanced funds (OAF). DOCKERY and the CI had a brief conversation which was recorded on the covert audio/ video recording device. Upon review of the covert video recording, the video depicts the CI entering the backseat of the silver Chrysler 300. The CI and a male have a conversation, which was captured on the device, and the CI's hand is observed reaching toward the front seats with the OAF in hand. A few second later, the CI is observed with a clear plastic bag in hand before the CI returns to officers/ agent's location. Though DOCKERY's voice can be heard on the recording, his face is not visible

32.    The purported crystal methamphetamine obtained from DOCKERY by the CI during the third controlled purchase was field-tested with positive

results and weighed approximately 29.0 grams with packaging. The substance has been sent to the Drug Enforcement Administration (DEA) forensic laboratory for analysis and the results are still pending.

**Controlled Purchase No. 4**

33.     On February 13, 2020, officers/agents met with the CI for the purpose of conducting a fourth controlled purchase of one-quarter ounce (7 grams) of crystal methamphetamine by the CI from DOCKERY. Through additional investigation described in further detail below, law enforcement officers were aware that DOCKERY often is also located at the residence at 1698 Hamilton Drive, Urbana, Illinois (the SUBJECT PREMISES). In advance of the controlled purchase, officers/ agents positioned themselves outside of the trailer located at 1698 Hamilton Drive Urbana, Illinois, address. Other officers/ agents met with the CI at a separate location. Once again, the CI made a recorded phone call to DOCKERY at 217-530-8188 and a male identified by the CI as DOCKERY answered. The CI and DOCKERY agreed to meet at a pre-arranged location within the Central District of Illinois in Champaign, Illinois. Prior to this meeting, the CI was searched for currency and contraband with negative results. The CI was then provided with $200 official advanced funds (OAF) and audio/video recording devices. The CI then waited, at the meet location, for DOCKERY to arrive while officers/ agents maintained constant visual surveillance of the CI.

34.     While the CI was speaking to DOCKERY via telephone, officers/ agents observed DOCKERY arrive at the SUBJECT PREMISES in the same silver Chrysler bearing Illinois Registration BV17275 and park in the driveway. DOCKERY

was then observed exiting said vehicle and entering the north side door to the trailer.

When he entered the SUBJECT PREMISES, surveilling officers observed DOCKERY

appeared to be talking on a telephone.

35.     Moments after the CI called DOCKERY, officers/ agents observed

DOCKERY exit the SUBJECT PREMISES and re-enter the Chrysler. DOCKERY then

drove the Chrysler through the trailer park toward the west entrance near Cunningham

Drive. During this drive through the trailer park, visual surveillance was temporarily

lost on the Chrysler.

36.     Approximately seven minutes later, officers/ agents reacquired

visual of DOCKERY's vehicle at a parking lot of an area store. The driver of the

Chrysler met with a pickup truck temporarily before leaving the parking lot. Based on

my training and experience investigating drug-trafficking, this quick interaction

between two persons appeared consistent with a narcotics transaction. Moments later,

officers/ agents again lost visual surveillance of the Chrysler as it exited the parking lot

of the store.

37.     Approximately twelve minutes later, officers/ agents observed the

same silver Chrysler 300 arrive at the meet location where the CI was waiting. The

vehicle parked near the CI's location, and officers/ agents observed the CI walk toward

the Chrysler 300 sedan and enter the front-passenger seat of the vehicle.

38.     After approximately one minute, officers/ agents observed the CI

exit the Chrysler, close the door to the vehicle, and then Chrysler sedan departed the

area. The CI then proceeded back to the meet location while under the constant visual surveillance of officers/ agents.

   39. Once DOCKERY was out of the vicinity of the buy location, the CI met with officers/ agents and provided them with the purported crystal methamphetamine that the CI purchased from DOCKERY. The CI stated when he/ she opened DOCKERY's door, DOCKERY was the sole occupant of the vehicle. The CI stated he/ she handed DOCKERY $200 of United States Currency/OAF and in exchange, DOCKERY handed the CI a quantity of crystal methamphetamine. DOCKERY and the CI had a brief conversation which was recorded on the covert audio/ video recording device.  Upon review of this recording, the video depicts the CI entering the front passenger seat of the silver Chrysler 300. The CI and DOCKERY have a conversation, which was captured on the device, and the CI is observed completing an apparent hand-to-hand transaction with DOCKERY. DOCKERY's face is readily identifiable on the covert footage. DOCKERY can then be seen taking the OAF from the CI and counting it before placing it into the cupholder. A few second later, the CI exited DOCKERY's vehicle and returned to officers/ agent's location.

   40. The purported crystal methamphetamine obtained from DOCKERY by the CI was field-tested with positive results and weighed approximately 8.0 grams with packaging. The substance has been sent to the Drug Enforcement Administration (DEA) forensic laboratory for analysis, and the results are still pending.

Controlled Purchase No. 5

41.     On February 20, 2020, officers/agents met with the CI for the purpose of conducting a fifth controlled purchase of one-half ounce (14 grams) of crystal methamphetamine by the CI from DOCKERY. In advance of the controlled purchase, officers/agents positioned themselves outside of the trailer located at the SUBJECT PREMISES. Other officers/ agents met with the CI at a separate location. Once again, the CI made a recorded phone call to DOCKERY at 217-530-8188 and a male identified by the CI as DOCKERY answered. The CI and DOCKERY agreed to meet at a specific location within the Central District of Illinois in Champaign, Illinois. Prior to this meeting, the CI and his/ her vehicle were searched for currency and contraband with negative results. The CI was then provided with $360 OAF and equipped with audio/video recording devices. The CI then entered his/her vehicle, and proceeded directly to the prearranged meet location to wait for DOCKERY to arrive, while officers/ agents maintained constant visual surveillance of the CI.

42.     Prior to the above-described recorded telephone call between DOCKERY and the CI, officers/ agents observed the same silver Chrysler 300 bearing Illinois Registration BV17275 parked in the driveway at SUBJECT PREMISES.

43.     After the above-described call was completed, the CI entered his/her vehicle and proceeded directly to the pre-arranged buy location. The CI was followed by officers, who maintained constant visual surveillance of the CI. The CI arrived at the buy location to await DOCKERY's arrival, while still under surveillance.

44. After the CI arrived at the buy location, DOCKERY exited the SUBJECT PREMISES through the front door. DOCKERY then proceeded to the silver Chrysler, entered the vehicle momentarily, then exited the vehicle and re-entered the SUBJECT PREMISES.

45. Moments later, DOCKERY was again observed exiting the SUBJECT PREMISES. Surveilling officers observed that DOCKERY appeared to be talking on a cellular phone. DOCKERY then entered the driver's seat of the Chrysler 300 and backed out of the driveway at the SUBJECT PREMISES. Officers/ agents maintained constant visual surveillance of the Chrysler as it proceeded directly to the buy location and parked.

46. Upon DOCKERY's arrival at the buy location, the CI exited his/ her vehicle and entered the front seat of the Chrysler. Approximately one minute later, the CI exited DOCKERY's vehicle and returned to his/ her vehicle while officers/ agents maintained constant visual surveillance of the CI and DOCKERY. The CI was followed until he/ she met officers/ agents at a pre-arranged location while other officers/agents maintained constant visual surveillance of DOCKERY and the Chrysler as he traveled back to the SUBJECT PREMISES.

47. After the Chrysler arrived back at the SUBJECT PREMISES, officers observed DOCKERY exited the vehicle and proceed to an entry door to the residence. Officers/ agents then observed DOCKERY appearing to utilize keys to gain entry into the SUBJECT PREMISES.

48.     Officers/ agents again met with the CI following the controlled purchase. The CI provided officers with the purported crystal methamphetamine that the CI had purchased from DOCKERY. The CI stated when he/ she arrived at the pre-arranged meet location he/ she contacted DOCKERY via telephone. The CI stated he/ she awaited DOCKERY's arrival and exited his/ her vehicle as DOCKERY parked. The CI entered the front passenger seat and observed DOCKERY as the sole occupant of the vehicle. DOCKERY handed the CI a quantity of crystal methamphetamine and in exchange, the CI handed DOCKERY $360 dollars of Official Advanced Funds (OAF). DOCKERY. The CI had a brief conversation with DOCKERY, which was recorded on a covert audio/video recording device.  Upon review of this recording, the video depicts the CI contacting DOCKERY upon his/ her arrival at the pre-arranged meet location. The CI then exits his/ her vehicle and enters the front passenger seat of the silver Chrysler 300. The CI and DOCKERY have a conversation, which was captured on the device, and DOCKERY's face is readily identifiable in the video. DOCKERY can be seen extending his arm toward the CI, who is seated in the front passenger seat, and was later observed holding currency (the hand-to-hand transaction was not captured). DOCKERY then places currency near the cup holder of the vehicle as the CI and DOCKERY have a brief conversation.  A few seconds later, the CI exits DOCKERY's vehicle and returns to officers/ agent's location.

49.     The purported crystal methamphetamine obtained from DOCKERY by the CI was field-tested with positive results and weighed approximately 14.9 grams with packaging. The substance has been sent to the Drug Enforcement

Administration (DEA) forensic laboratory for analysis and the results are still pending.

**Controlled Purchase No. 6**

50.     On March 3, 2020, officers/agents met with the CI for the purpose of conducting a sixth controlled purchase of crystal methamphetamine by the CI from DOCKERY. In advance of this controlled purchase, officers/agents again positioned themselves outside of the SUBJECT PREMISES. Other officers/ agents met with the CI at a separate location. Once again, the CI made a recorded phone call to DOCKERY at 217-530-8188 and a male identified by the CI as DOCKERY answered. The CI and DOCKERY agreed to meet at a specific location within the Central District of Illinois in Champaign, Illinois. Prior to this meeting, the CI and his/ her vehicle were searched for currency and contraband with negative results. The CI was then provided with official advanced funds (OAF) and equipped with audio/video recording devices. The CI then entered his/her vehicle, and proceeded directly to the meet location to wait for DOCKERY to arrive, while officers/ agents maintained constant visual surveillance of the CI.

51.     Prior to the above-described telephone call between DOCKERY and the CI, officers/ agents observed the same silver Chrysler 300 bearing Illinois Registration BV17275 parked in the driveway at SUBJECT PREMISES.

52.     After the CI arrived at the pre-arranged buy location, the front door of the SUBJECT PREMISES opened, and officers observed DOCKERY and an unknown female exit. DOCKERY then proceeded to the silver Chrysler and entered

the vehicle driver's seat of the vehicle; the female entered the front passenger seat. The

Chrysler 300 then backed out of the driveway at the SUBJECT PREMISES. Officers/

agents maintained constant visual surveillance of DOCKERY's vehicle as it proceeded

directly to the buy location and parked.

        53.    Upon arrival at the buy location, the Chrysler parked near another

vehicle and the female occupant of the Chrysler was observed exiting the front

passenger seat, while DOCKERY remained inside. An unknown male then entered the

front passenger seat of the Chrysler, where he remained for less than thirty seconds.

        54.    Upon DOCKERY's arrival at the pre-arranged buy location, the CI

exited his/ her vehicle and proceeded toward the Chrysler. Upon the CI's arrival at the

Chrysler, the unknown male exited the front seat of the vehicle and the CI then entered

the front seat. Approximately one minute later, the CI exited DOCKERY's vehicle. The

unknown female who had traveled to the buy location with DOCKERY was then

observed re-entering the Chrysler. The CI then returned to his/ her vehicle while

officers/ agents maintained constant visual surveillance of the CI and DOCKERY. The

CI was followed until he/ she met officers/ agents at a pre-arranged location while

other officers/agents maintained constant visual surveillance of DOCKERY as he left

the pre-arranged buy location. DOCKERY was followed as he proceeded toward a

business. DOCKERY then turned around and proceeded back to the SUBJECT

PREMISES.

        55.    After arriving at the SUBJECT PREMISES, DOCKERY and the

female exited the Chrysler 300 and proceeded to an entry door to the residence.
Officers/ agents then observed DOCKERY appearing to utilize keys to gain entry into
the SUBJECT PREMISES before entering.

      56.    Officers/ agents met with the CI. Upon meeting him/ her, the CI
provided them with the purported crystal methamphetamine that the CI purchased
from DOCKERY. The CI stated when he/ she arrived at the pre-arranged meet
location he/ she contacted DOCKERY via telephone. The CI stated he/ she awaited
DOCKERY's arrival and exited his/ her vehicle as DOCKERY parked. As the CI
approached DOCKERY's vehicle, an unknown white male exited the front passenger
seat and walked away. The CI then entered the front passenger seat and observed
DOCKERY as the sole occupant of the vehicle. DOCKERY handed the CI a quantity of
crystal methamphetamine and in exchange, the CI handed DOCKERY Official
Advanced Funds (OAF). DOCKERY and the CI had a brief conversation which was
recorded on a covert audio/ video recording device.  Upon review of this recording,
the video depicts the CI contacting DOCKERY upon his/ her arrival at the meet
location. The CI then exits his/ her vehicle and observes the unknown white male
before the CI then enters the front passenger seat of the silver Chrysler 300. The CI and
DOCKERY have a conversation, which was captured on the device. DOCKERY's face
is readily identifiable on the video. DOCKERY can be seen extending his arm toward
the CI, who is seated in the front passenger seat, and was later observed holding
currency. Furthermore, a portion of the hand-to-hand transaction was captured. A few
seconds later, the CI exits DOCKERY's vehicle and returns to officers/ agent's location.

57.    The purported crystal methamphetamine obtained from
DOCKERY by the CI during the sixth controlled purchase was field-tested with positive
results and weighed in excess of 28 grams with packaging. The substance has been sent
to the Drug Enforcement Administration (DEA) forensic laboratory for analysis and the
results are still pending.

### Additional Investigation

58.    Following the first controlled purchase in December 2019, Detective
Phenicie conducted an Illinois Secretary of State query on license plate number
BW22227, the Illinois registration attached to the black Jaguar XF. Illinois Secretary of
State Records indicate that the Jaguar XF is registered to a female named ALANTA N.
WALLACE [F/B, DOB: 08/09/93, hereinafter referred to as "WALLACE"] with a listed
address of 419 N. Bowman Avenue Danville, Illinois 61832. It is unknown what
DOCKERY and WALLACE's relationship is; however, a check of social media revealed
DOCKERY and a female with the profile name 'Alanta Wallace' are 'friends' on
Facebook.  It is also known from previous investigations conducted by the Champaign
Police Department that DOCKERY has associates and family who reside in the Danville
(IL) area.

59.    After identifying the registration on the Jaguar XF, Detective
Phenicie conducted periodic area checks of various locations in the Champaign-Urbana
area and located the Jaguar XF parked in the driveway of 3707 Boulder Ridge
Champaign, Illinois on December 30, 2019, while conducting another unrelated
investigation. After locating the Jaguar XF on December 30, 2019, officers/ agents

conducted routine spot checks at 3707 Boulder Ridge Champaign, Illinois, over the following weeks and routinely observed the Jaguar parked outside that residence. Of note, the last time the Jaguar was located at this residence was in February 2020.

60.     Following the third controlled purchase in February 2020, Detective Phenicie also conducted an Illinois Secretary of State query on license plate number BV17275, the Illinois registration which is attached to the silver Chrysler 300. Illinois Secretary of State Records indicate that the Chrysler 300 is registered to a female named Melina C.J. Evans [F/B, DOB: 12/11/91, hereinafter referred to as "EVANS"] with a listed address of 409 S. Dodson Drive Urbana, Illinois 61802. It is known from previous investigations conducted by the Champaign Police Department and social media posts that EVANS is DOCKERY's sister.

61.     Officers/ agents have observed the Chrysler 300 bearing BV17275 parked in the driveway or in front of 3707 Boulder Ridge Drive Champaign, Illinois, on various dates during the months of February and March 2020. These checks have been conducted by detectives in the early morning hours, as well as in the late evening hours.

62.     Additionally, during the week of February 10, 2020, Detective Phenicie and your affiant were present in the area of E. Perkins Road in Urbana, Illinois, and observed the Chrysler 300 traveling eastbound on Perkins Road in Urbana, Illinois. The vehicle was followed until it arrived at the SUBJECT PREMISES and parked in a driveway outside that residence. After locating the Chrysler 300 during the week of February 10, 2020, officers/ agents have conducted routine spot checks at the SUBJECT PREMISES and have routinely observed the Chrysler parked in a driveway of that

residence. Most recently, your affiant observed the vehicle in the driveway of the

SUBJECT PREMISES at approximately 5:30 a.m. on March 5, 2020.  These checks have

been conducted by detectives in the early morning hours, as well as in the late evening

hours.

## CONCLUSION

63.    Based on my training and experience, I am aware that persons

involved in the illicit trafficking of narcotics routinely utilize residences to store the

drugs they are distributing as well as the money obtained as a result of those sales.

Further, I am aware that when residences are so utilized, the narcotics trafficker will

often visit the residence immediately before or after a drug sale. As a result, items

involved in the trafficking of narcotics, including drugs, proceeds, records, packaging

materials, and scales, are often located at the residences being used by narcotics

traffickers.

64.    Based on the forgoing, I believe DOCKERY is actively involved in

the trafficking of narcotics, specifically methamphetamine, in and around the

Champaign, Illinois, area. Further, I believe the above facts demonstrate that

DOCKERY utilizes the residence at 1698 Hamilton, Urbana, Illinois (SUBJECT

PREMISES) in furtherance of those activities, and that instrumentalities, fruits, and

evidence of his drug trafficking activities will be located inside the SUBJECT

PREMISES.

65.    Because this investigation is ongoing and its success would be

jeopardized if its contents of this Affidavit were made public at this time, I am

requesting that this Affidavit and the accompanying Search Warrant documents be sealed until further Court Order.

      66.    Based upon my training and experience in investigating illegal drug trafficking organizations, including their financial operations, my discussions with other law enforcement agents with greater experience, and during investigative interviews, and my participation in the execution of other search warrants, I am further aware of the following:

      a.  Persons and organizations illegally trafficking in controlled substances generally have large amounts of currency on hand in a location to which they have ready access and which they believe to be secure, since the illegal nature of drug transactions causes them to almost always be conducted in cash.

      b.  Persons and organizations trafficking illegally in controlled substances usually maintain books, receipts, notes, ledgers, or other forms of records relating to the ordering, purchase, receipt sale, or distribution of controlled substances. Drug traffickers commonly obtain and/or distribute controlled substance on a "front" (consignment) basis and must keep track of money owed by and to them. Records of those and other transactions are typically maintained in locations to which the drug traffickers have ready access and which they believe to be secure.

c.  The large amount of currency involved in and derived from illegal
    drug trafficking commonly leads to a variety of financial
    transactions relating to obtaining, transferring, depositing,
    withdrawing, converting, or storing large amounts of currency, and
    spending large sums of money in cash and other forms. It is
    common for drug traffickers to maintain records, receipts, and
    other evidence of such expenditures and financial activities,
    including such items such as jewelry, precious gems, safe deposit
    box keys, and money wrappers, as well as invoices, sales receipts,
    receipts relating to the purchase of financial instruments and the
    transfer of funds, records of real estate transactions, statements of
    account, deposit slips, money orders and cashier's checks and
    related receipts, canceled checks, check registers, other records
    from financial institutions, ledgers, financial statements, stock
    certificates, bonds, other financial instruments, credit card records,
    and similar receipts and records.

d.  Because large expenditures of cash by someone with no apparent
    legitimate source for that much currency can arouse suspicions and
    lead to reports to and investigations by law enforcement agencies,
    drug traffickers commonly engage in various financial transactions
    designed to disguise the source of their drug money or to convert it
    into some apparently legitimate asset or form of income so it can

be spent or transferred without attracting the attention of law enforcement authorities, which is commonly referred to as "money laundering." Records of such financial transactions are typically retained by the traffickers and include invoices, sales receipts, receipts relating to the purchase of financial instruments and the transfer of funds, records of real estate transactions, statements of account deposit slips, money orders and cashier's checks and related receipts, canceled checks, check registers, other records from financial institutions, ledgers, financial statements, stock certificates, bonds, other financial instruments, credit card records, and similar receipts and records.

e. As part of such money laundering activities, illegal drug traffickers often purchase and/or title their assets in fictitious names or aliases, or in the names of relatives, associates, or business entities to avoid detection of those assets and their true ownership by the government and law enforcement agencies, Even though such assets are in names other than the drug traffickers actually own and continue to use these assets, and exercise dominion and control over them. Therefore, the records and receipts described above are often in the names of nominees.

f. Persons and organizations illegally trafficking in controlled substances usually maintain books, notes, or other records

containing personal notations of names, addresses, and/or telephone numbers of their drug customers, suppliers, distributors, couriers, and other criminal associates.

g.  Persons involved in illegal drug trafficking very often travel to other locations to meet with suppliers, other drug distributors, associates, or customers, and subsequently retain records of that travel such as receipts for expenditures such as the purchase of fuel at service stations or meals, copies of tickets or receipts for public transportation, transportation or travel schedules, car rental agreements and receipts, and other notes.

h.  Persons involved in illegal drug trafficking often take or keep photographs of their drug associates, property, or drug product. Those photographs are usually maintained at their residences or places of drug business.

i.  Persons involved in illegal drug trafficking usually maintained the substantial amounts of currency, other assets, and various types of records described above in secure locations to which they have ready access and over which they have control, directly or through others, such as their homes.

67.     I respectfully submit this affidavit establishes probable cause for a Search Warrant for the apartment located at **1698 Hamilton Drive in Urbana, Illinois 61802.**

Further, affiant sayeth not.

s/Cully Schweska

Cully Schweska
ATF Task Force Officer

Subscribed and sworn to before me this
_10_ day of March, 2020
s/Eric Long

ERIC I. LONG, United States Magistrate Judge

**Attachment A**
*Property to Be Searched*

The SUBJECT PREMISES is described as a green-sided trailer home with white

colored trim and the numerals "1698" affixed to the east side of the residence, located

at 1698 Hamilton Drive Urbana, Illinois. The SUBJECT PREMISES also has an

approximate Global Positioning System (GPS) coordinates of 40.13245684,

-88.18549441.

**Attachment B**
*Description of Items to Be Seized and Searched*

The following records, documents, items, files, or materials, in whatever form (such as printed, written, handwritten, or typed) that constitute or contain evidence, instrumentalities, or fruits of violations of Title 21, United States Code, Sections 841, Distribution of a Controlled Substance, including:

1. Illegal controlled substances;

2. Substantial amounts of currency; possibly contained in safes, lock-boxes or other security containers;

3. Books, receipts, notes, ledgers, or other physical records evidencing the ordering, purchase, receipt, sale, or distribution of controlled substances and/or currency collected from controlled substance transactions, including present or past debts owed to or from other persons;

4. Financial records and other items relating to obtaining, transferring, depositing, withdrawing, converting, or storing large amounts of currency, or spending large sums of money in cash or other forms, including, but not limited to, such items and records as jewelry, precious gems, safe deposit box keys, money wrappers, invoices, sales receipts, receipts relating to the purchase of financial instruments and the transfer of funds, records of real estate transactions, statements of account, deposit slips, money orders and cashier's checks and related receipts, canceled checks, check registers, passbooks, other records from financial institutions, ledgers, financial statements, stock certificates, bonds, other financial instruments, credit card records, and vehicle titles;

5. Books, notes, or other records containing personal notations of names, addresses, telephone numbers, currency notations, insurance information or other information related to the distribution of controlled substances or monetary transactions;

6. Tickets, car rental receipts, schedules, notes, or other records evidencing travel outside the immediate municipal area;

7. Photographs of other persons, property, currency or controlled substances constituting evidence of associations between persons participating in controlled substance trafficking;

8. Records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence;

9. Telephone records, bills and receipts of purchase;

10. Cellular telephones;

11. Firearms and ammunition; and

12. Paraphernalia for weighing, diluting, packaging, and distributing illegal controlled substances including, but not limited to, scales, plastic bags with missing corners, grinders, sifters, and diluting agents.